THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAN SHELBY, Defendant-Appellant.

First District (5th Division)   No. 83—225

Opinion filed March 30, 1984.

David W. Miesmer, of Levine, Wittenberg, Eisner, Newman & Silverman, of Harvey, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Garritt E. Howard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant was convicted of home invasion, attempt rape, residential burglary and unlawful restraint (Ill. Rev. Stat. 1981, ch. 38, pars. 12—11, 8—4(a), 19—3, 10—3, respectively), and was sentenced to terms of 20 years for home invasion, 12 years for attempt rape, and 12 years for residential burglary. He was not sentenced for unlawful restraint. On appeal, he contends that: (1) the trial court erred in denying his motion in arrest of judgment because count III of the information failed to state an offense; (2) his identification was not established beyond a reasonable doubt; and (3) he was not proved guilty of the offenses beyond a reasonable doubt. For the following reasons, we affirm the judgment of the circuit court.

The record discloses that between 10:30 and 11 p.m. on September 13, 1982, the complainant, who lived in a house in Dixmoor with her mother and niece, went to bed. She was wearing a short nightgown. Shortly after midnight, she was awakened by pressure on her bed that felt like someone was getting into bed with her. At the time, she was lying half on her back and half on her side. When she opened her eyes, she noticed that her bedroom window, which she had closed before going to bed, was now open. She then turned to look behind her and saw a hand coming down over her face covering her mouth and heard a voice say, "shish." She screamed and started kicking and swinging at the hand. The person in bed with her was swinging at her in an effort to grab her hands. The struggle lasted between 1½ and 2 minutes, after which the person got out of bed and leaped out the window.

The complainant testified that she saw the side of the intruder's face as he leaped out of the bedroom window which was illuminated by a street light. She described the intruder as a black man, approximately five feet six inches tall with no facial hair, a muscular build, and wearing dark clothes. She later identified defendant as the intruder. Complainant then got out of bed and went to her niece who was in the living room. Her niece tried to shut the bedroom window, but was unable to do so. Complainant then telephoned the police.

Further testifying, complainant stated that after the police took her statement and left, Reginald Fitzgerald, a neighbor, told her that the man he saw running away from her house was Dan Shelby. She went to the police station the next day, viewed a lineup and identified defendant on the basis of his height, hair and arm muscles. She further stated that she knew defendant before the incident and that he lived within four blocks of her house. Complainant was unmarried and never gave defendant permission to enter her house or her bedroom.

On cross-examination, complainant acknowledged that when she was interviewed by the police prior to the lineup, she did not tell them that Dan Shelby was the person who had entered her bedroom. Further, she did not immediately tell her niece that the person in her room was Dan Shelby.

Antoinette Kimmons, complainant's niece, stated that she had been watching Monday Night Football and fell asleep on the couch in the living room. She was awakened by complainant's screams in the hallway outside her bedroom. She further stated that complainant told her that someone was in her room and that she sounded frightened at the time she made the statement. Kimmons walked to complainant's bedroom and tried to close the window, but it would not close.

Reginald Fitzgerald then testified that on the night of September 13, he was sitting in his automobile, in front of his house, smoking a cigarette and listening to the radio with the windows rolled down when he heard noises coming from complainant's house, followed by screams. He got out of his car and walked toward the front of complainant's house. When he got to the front walkway, where there was an opening in the hedge, he stopped, and while standing there, he saw a male peek over the hedge to his left. The man was about 15 feet from where Fitzgerald was standing. Fitzgerald was able to view the man's face for approximately four seconds and recognized him as defendant. Fitzgerald further testified that defendant was wearing a dark colored T-shirt and dark colored pants. Defendant then ran in a northerly direction on the other side of the hedge from where Fitzgerald was standing and Fitzgerald ran after him.

At trial, Fitzgerald identified defendant as the person he saw that night. He further stated that after defendant ran past complainant's house, he lost sight of him. However, he thought that defendant had run down the gangway next to a house north of complainant's house. While searching for defendant, Fitzgerald saw Janice Ratliff standing with a group of people on the corner of 142nd and Marshfield. He knew that Ratliff was acquainted with defendant, but did not inform her as to the name of the person he was chasing.

Further testifying, Fitzgerald stated that he was acquainted with defendant and knew where he lived in Dixmoor. In addition, he stated that he had heard certain things about defendant from people in the neighborhood. After losing sight of defendant, Fitzgerald returned the complainant's house and saw Irene Riley and Hoover Darden walking up the driveway.

On cross-examination, Fitzgerald stated that he recognized defendant when he first looked at him, but the first person he told

that night that the person he chased was defendant was a police officer.

Irene Riley, complainant's mother, testified that approximately midnight, she was standing across the street from her house talking to Hoover Darden, a neighbor, when she saw two boys running down the street. She recognized the second person as Fitzgerald, but did not recognize the first person who she described as five feet tall, with a muscular build, medium afro, and wearing dark clothing. Irene saw the first person run between the two houses just north of her residence. Fitzgerald later returned, crossed the street, and told her to check on complainant because she was screaming. Irene and Darden then went to Irene's house and saw complainant sitting on the couch, screaming.

Hoover Darden's testimony was substantially similar to that of Irene. However, he did not give a description of the first man he had seen running except to say that he was a black man.

Albert Romito, a police officer with the sheriff of Cook County, testified as an expert witness based on his experience as an evidence technician. Romito stated that he was contacted by the Dixmoor police and went to the Dixmoor police department where he dusted a pane of glass for fingerprints and lifted four latent prints.

Joseph Mortimer testified as an expert print examiner and stated that he received the four latent prints and three of them were not suitable for comparison, and the one suitable print had not been made by defendant. Mortimer further testified that this latent print was identical to a print of complainant.

Against this evidence, the defense first presented Mildred Shelby, defendant's mother. She testified that on September 13, 1982, at 11:45 p.m., she was at her house in Chicago Heights when her son, Daniel Shelby, Jr., arrived and entered the kitchen. He then stayed at the Chicago Heights home. He was wearing a beige shirt, blue jeans and blue gym shoes. Approximately 12:30 a.m., she received a telephone call from her son David who was at their other home in Dixmoor. He wanted to talk to his father, thus Mrs. Shelby woke her husband. After speaking to David, her husband called the Dixmoor police station. Approximately 3 a.m., her husband and Daniel left the house.

On cross-examination, Mrs. Shelby stated that the Dixmoor police did not call her house that night and that her son Daniel did not own a dark shirt. Further, she testified that all of Daniel's clothes were purchased by her and that they were kept in a closet in the Chicago Heights home.

Daniel Shelby, Sr., defendant's father, testified that he owns two

houses, one located in Dixmoor and the other in Chicago Heights. On the night of September 12, he went to sleep about 11 p.m. and was awakened by his wife's voice on the telephone about 12:30 a.m. He arose and went to the kitchen where he was told that his son David wished to speak to him. After a telephone conversation with David, he called the Dixmoor police department and was told that the police would like to talk to his son Daniel. He further stated that he first saw Daniel that morning when he walked into the kitchen at 12:30 a.m. and that Daniel was wearing a beige shirt and blue jeans.

On cross-examination, Daniel, Sr., testified that his son Daniel lives at the Chicago Heights home, but his younger children, one boy and three girls, live at the Dixmoor home. Further, he stated that he and his wife buy Daniel's clothes except when he is employed and able to buy his own clothes. He further testified that Daniel Jr. does own some dark shirts.

The jury returned guilty verdicts on all counts. Prior to sentencing, defendant filed a motion in arrest of judgment which challenged count III of the information. The motion was denied, and the court sentenced defendant on all counts except unlawful restraint.

OPINION

On appeal, defendant first contends that the trial court erred in denying his motion in arrest of judgment because the information on the count III attempt rape charge lacked the specificity necessary to charge him with the offense. We cannot agree.

It is well established that where the sufficiency of a charge is attacked in a motion in arrest of judgment, the standard for determining whether the information is deficient is whether the elements of the offense are set out in the information as required by section 111—3(a) of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1981, ch. 38, par. 111—3(a); *People v. Simmons* (1982), 93 Ill. 2d 94, 99, 442 N.E.2d 891.) This section requires that the charging instrument be in writing, stating the name of the offense and the relevant statutory offenses violated; setting forth the nature and elements of the offense and the date and county in which the offense occurred, and naming the accused, if known, or a reasonably certain description. The section is designed to inform the accused of the nature of the offense with which he is charged so that he may prepare a defense and to make certain that the charged offense may constitute a bar to subsequent prosecution arising out of the same conduct. (*People v. Simmons* (1982), 93 Ill. 2d 94, 99-100, 442 N.E.2d 891, citing *People v. Lutz* (1978), 73 Ill. 2d 204, 383 N.E.2d 171.) An information which charges

an offense in the language of the statute is sufficient when the words of the statute so particularize the offense that by their use alone an accused is informed with reasonable certainty of the precise offense charged. *People v. Dickerson* (1975), 61 Ill. 2d 580, 582, 338 N.E.2d 184.

In the present case, the information charging defendant with the crime stated:

> "\*\*\* [O]n September 14, 1982, Dan Shelby, Junior, a male person of the age of fourteen years and uowards [*sic*] committed the offense of attempt in that he, with the intent to commit the offense of rape, attempted to compel one [name omitted], a female not the wife of said Dan Shelby, Junior, to submit to an act of sexual intercourse, by force and against her will."

To uphold the sufficiency of this information, the State argues that our decision in *People v. Testa* (1983), 114 Ill. App. 3d 695, 449 N.E.2d 164, involving an identical charging information, is dispositive of the issue. We agree. The charging instrument in *Testa* read as follows:

> " '\*\*\* [O]n January 9, 1980 in Cook County, Illinois Thomas A. Testa a male person of the age of fourteen years and upwards committed the offense of attempt in that he, with the intent to commit the offense of rape attempted to compel one [name omitted] a female not the wife of said Thomas A. Testa to submit to an act of sexual intercourse by force and against her will, in violation of chapter 38, section 8—4 Illinois Revised Statutes \*\*\*.' " (114 Ill. App. 3d 695, 697-98.)

In *Testa*, we held that our prior decision in *People v. Mack* (1974), 24 Ill. App. 3d 455, 321 N.E.2d 446, relied on by defendant, was distinguishable due to its peculiar facts. Therefore, we followed *People v. Bonner* (1967), 37 Ill. 2d 553, 229 N.E.2d 527, and held that the *Testa* information was sufficient in that defendant was charged with the elements of the offense in the language of the statute, *i.e.*, (1) attempt with intent to commit rape, and (2) a substantial step taken in that direction—the use of force against the complainant's will.

In *Mack*, cited by defendant in support of his contention that the information charging him failed to state a cause of action, the charging instrument upon which defendant was convicted was handwritten, filed the day of trial, and failed to meet the requirements of section 111—3. In addition, a form, identical to the language in the information in the pending case, was submitted to the trial court and read to the jury. The court in *Mack* held that the "form" language was sufficient to allege defendant had the specific intent to commit

the offense of rape. (*People v. Mack* (1974), 24 Ill. App. 3d 455, 459, 321 N.E.2d 446.) The record in the pending case is not similar to the confusing record in *Mack*. However, the information in this case is identical to the information in *People v. Testa* (1983), 114 Ill. App. 3d 695, 449 N.E.2d 164. Accordingly, we hold that our decision in *Testa* controls the issue of sufficiency of the information.

■ In the present case, defendant was charged in the language of the statute with the elements of the offense, *i.e.*, (1) attempt with the intent to commit rape and (2) a substantial step taken in that direction—the use of force against the complainant's will. (*People v. Bonner* (1967), 37 Ill. 2d 553, 562, 229 N.E.2d 527.) The information was, therefore, sufficient to allow defendant to prepare his defense and to serve as a bar to future prosecution arising from the same conduct.

Defendant argues that his conviction for attempt rape cannot stand since the state failed to prove beyond ·a reasonable doubt that he possessed the specific intent to have sexual intercourse with the victim and that a substantial step was taken toward the commission of the act of rape. We disagree.

The statutory definition of "attempt" is as follows:

> "A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." Ill. Rev. Stat. 1981, ch. 38, par. 8—4(a).

Defendant was charged with attempting to commit the specific offense of rape. The offense of rape is committed by only one type of activity, sexual intercourse. Ill. Rev. Stat. 1981, ch. 38, par. 11—1.

■■ ■ In *People v. Bonner* (1967) 37 Ill. 2d 553, 229 N.E.2d 527, the court found defendant guilty of attempted rape even though there was no exposure of the genitals or words spoken voicing his intention. There also was no effort made to take the victim's purse or property. On similar facts, the court in *People v. Mayer* (1945), 392 Ill. 257, 64 N.E.2d 372, upheld a judgment entered on a jury verdict of guilty for the crime of assault with intent to commit rape, and posed the following rhetorical question:

> "Under these circumstances, does the law require the offense to be limited to assault and battery because the intent was not voiced in language, or the victim had not been sufficiently overcome for the assailant's physical acts to more completely manifest his intentions?" (392 Ill. 257, 259.)

Furthermore, the intention to accomplish intercourse by force and against a female's will may be inferred by the circumstances sur-

rounding the conduct of the accused, the character of the assault, the nature of the acts done, and the time and place of the occurrence. (*People v. Hanley* (1977), 50 Ill. App. 3d 651, 659, 365 N.E.2d 676.) Specific intent to rape may be inferred even where the accused did not remove his clothing or the clothing of the victim. (*People v. Oetgen* (1978), 62 Ill. App. 3d 29, 32, 378 N.E.2d 1355.) Moreover, the victim's successful struggle to defeat the assailant's purposes does not change the nature of the attack or destroy the specific intent to rape. *People v. Hanley* (1977), 50 Ill. App. 3d 651, 659, 365 N.E.2d 676; *People v. Hamil* (1974), 20 Ill. App. 3d 901, 314 N.E.2d 251.

The State's evidence, uncontradicted by any testimony offered by defendant, shows that defendant knew the complainant prior to the incident and that he lived a block and one-half away from her house. He broke into the complainant's bedroom through a window and got into bed with her while she was asleep. He grabbed her from behind and placed his hand over her mouth ordering her to "shish." She screamed and started swinging and kicking at his hand. In turn, he was swinging at her in an effort to grab her hands. The struggle in bed went on for 1½ to 2 minutes until defendant got out of bed and leaped out of the window. Complainant was able to get a side view of defendant's face as he leaped out of the bedroom window, well lit by a nearby street light. She stated that the intruder was a black man, wearing dark clothes, approximately five feet six inches tall with no facial hair and a muscular build. Although defendant did not voice his intentions and remained fully clothed, the evidence indicates he knew whose house he was breaking into and also knew the occupant of the room into which he entered.

Reginald Fitzgerald, the complainant's neighbor, was sitting in his parked car next door to complainant's house at the time of the incident. When he heard noises and screams coming from complainant's house, he started walking to the front of the house. When he arrived approximately 15 feet away from the front entrance, he saw defendant peek over the bushes. Because they were standing under two street lights and the light was shining directly on defendant's face, Fitzgerald had a clear view of defendant. At that point, defendant began to run and Fitzgerald chased him but lost him when defendant ran between two houses. Fitzgerald recognized defendant as being a resident of the neighborhood and when the police arrived, he informed the police that defendant was the assailant.

The next day, the complainant identified defendant in a police lineup on the basis of his height, hair and arm muscles. At trial, both the complainant and Fitzgerald made in-court identifications of

defendant as the assailant. Defendant's mother, however, testified that he arrived home at 11:45 p.m. the night of the incident.

We point out that the assailant entered the complainant's room through a window. He awakened her as he entered her bed while she was lying half on her back and half on her side. She was dressed in a short nightgown. After opening her eyes she saw a hand coming down covering her mouth and heard defendant say "shish." A struggle ensued for approximately two minutes until defendant jumped out of bed and leaped out of the window. We further observe that complainant was a woman; defendant knew who she was; the assault was made at approximately midnight in the seclusion of her bedroom; the assault was violent; and the assault only ceased after the complainant successfully fought off defendant. If defendant possessed the requisite specific intent to have sexual intercourse, the act, in view of complainant's struggle, would obviously have been by force and against her will. All that was required to complete the crime of rape was the consummation. As the aforementioned cases have stated, the facts that the assailant's intent was not verbalized and the complainant successfully frustrated the assailant's purpose do not establish a lack of intent to rape. In our opinion, the very acts to which we have referred constituted the requisite "substantial step" toward commission of the offense of rape. On the basis of such evidence, we believe the jury could reasonably infer beyond a reasonable doubt that defendant intended to rape the complainant. Accordingly, the jury's verdict should be sustained. We would not be justified in determining that the jury verdict was so palpably contrary to the evidence or unsatisfactory as to indicate that defendant could not have been proven guilty beyond a reasonable doubt on the basis of such evidence. Reviewing courts are not to throw away their common sense when the record clearly demonstrates that the finding of guilty is supported by the evidence beyond a reasonable doubt. *People v. Testa* (1983), 114 Ill. App. 3d 695, 701, 449 N.E.2d 164.

Defendant's reliance upon *People v. Pitts* (1980), 89 Ill. App. 3d 145, 411 N.E.2d 586, in support of his contention that he was not proven guilty beyond a reasonable doubt of attempt rape is misplaced on the ground that *Pitts* is factually distinguishable from the present case. The court in *Pitts* determined that the circumstances did not establish an intent to commit the specific offense of rape since defendant made no overt movements toward the victims genital area. Although he threatened to kill the victim if she screamed, he made no reference to sexual intercourse. He obtained sexual satisfaction during the attack in a manner other than intercourse while both he and

his victim remained fully clothed. In the pending case, defendant was only prevented from physically manifesting his intent to rape by complainant's screaming and fighting.

Defendant next maintains that he was not proven guilty beyond a reasonable doubt of residential burglary because the evidence failed to prove that he entered with intent to commit the offense of rape. We find this argument to be without merit in light of our holding affirming the attempt rape conviction. On the basis of the record, defendant's conviction for residential burglary is upheld because the State proved beyond a reasonable doubt the essential elements of residential burglary which are as follows: (1) knowing and unauthorized entry into the dwelling place of another; (2) with intent to commit therein a felony or theft. Ill. Rev. Stat. 1981, ch. 38, par. 19—3.

Defendant also argues that he was not proven guilty beyond a reasonable doubt of home invasion because there was no evidence that complainant was injured. Again, defendant's argument is without merit. The purpose of the home invasion statute is to protect the safety of persons in their homes. (*People v. Pavic* (1982), 104 Ill. App. 3d 436, 447, 432 N.E.2d 1074.) The statute requires: (1) knowing and unauthorized entry into the dwelling place of another when he or she has reason to know that one or more persons is present; and (2) intentional injury to any person or persons within such dwelling place. Ill. Rev. Stat. 1981, ch. 38, par. 12—11.

Here, defendant got into bed behind complainant, placed his hand over her mouth causing her to swing, kick, and scream in an effort to remove his hand. Simultaneously, defendant was swinging at complainant and trying to grab her hands. This was sufficient to cause a battery. (*People v. Hamilton* (1980), 81 Ill. App. 3d 297, 301, 401 N.E.2d 318.) On the basis of the record, the jury could infer that complainant suffered physical pain during her struggle with defendant and thereby suffered the requisite injury sufficient to find defendant guilty beyond a reasonable doubt of home invasion.

Finally, defendant contends that he was not proven guilty beyond a reasonable doubt because the identification testimony was vague, doubtful and uncertain, particularly in light of his alibi defense. We reject this contention.

Defendant maintains that the testimony presented by complainant lacked credibility because she stated that she was only able to see a profile of the assailant. She described the assailant at trial. However, although she admitted that she had known defendant at the time of the incident, she failed to inform the police that defendant was her assailant when she spoke to them immediately after the incident and

on the following day prior to the lineup. Further, complainant admitted that in the description she gave to the police, she stated that the assailant had no facial hair. At trial, however, when confronted with the photograph of the lineup, she selected defendant, who had a moustache, as her assailant. In addition, she admitted that after the police had left her home the night of the incident, Fitzgerald, her next door neighbor, told her that defendant had run from her home. On the basis of this evidence, defendant argues that her later identification of defendant was doubtful and uncertain.

Defendant also points out that Fitzgerald was the only other witness to identify him. Fitzgerald testified that he saw defendant peeking over the bushes in front of complainant's house. He observed defendant run and pursued him but lost sight of him when defendant ran through a gangway approximately one-half block away from complainant's home. Although he knew defendant, he never called his name during the time he chased him, and when he met several persons near complainant's home who knew defendant, he did not ask them if they had seen defendant. Further, Fitzgerald did not tell Irene Riley, complainant's mother, that defendant was the person he had chased. Therefore, defendant argues that Fitgerald's identification testimony was too vague and inadequate to establish the identity of defendant as the assailant. Moreover, his alibi testimony established that he was home in Chicago Heights at the time of the incident.

It is well established that where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and viewed the accused under such circumstances as would permit a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) The sufficiency, weight and credibility of the identification testimony, as well as all of the other evidence adduced at trial, is a matter to be determined by the trier of fact, and we will not upset its determination unless the evidence of guilt is so unreasonable or unsatisfactory as to create a reasonable doubt of defendant's guilt. (*People v. Barber* (1979), 70 Ill. App. 3d 540, 388 N.E.2d 833.) We also bear in mind that any discrepancies or omissions in detail do not destroy the validity of an identification, but rather go to the weight of the testimony and are to be evaluated by the trier of fact. (*People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.) In this regard, it has been recognized that untrained persons may give varying descriptions of another person's physical

characteristics (see *People v. Hall* (1982), 104 Ill. App. 3d 1064, 433 N.E.2d 1039), and that an identification is not usually made by distinguishing separate features, but by the total impression made upon the witness. *People v. Lindsey* (1979), 72 Ill. App. 3d 764, 391 N.E.2d 382.

■ Applying these principles to the case at bar, we believe that the identification testimony presented by the State, if believed by the jury, was sufficient to convict defendant of the offenses. The evidence reveals that two witnesses positively identified defendant. Fitzgerald was positive of his identification of defendant because there was a street light shining on defendant's face. He informed the police of defendant's identity and, at trial, made an in-court identification of defendant.

The complainant did not see defendant's face during the struggle in bed, but she did get a view of his profile when he leaped out of the window, which was illuminated by a street light. The next day she identified defendant in a police lineup on the basis of his height, hair and arm muscles. At trial, she also made an in-court identification of defendant.

Against this evidence, defendant presented alibi testimony by a member of his family which was introduced to show that he was at home in Chicago Heights at the time of the occurrence. The trier of fact is not required to accept defendant's alibi testimony over the positive testimony by the victim even if the alibi testimony was given by a greater number of witnesses. (*People v. Taylor* (1981), 99 Ill. App. 3d 15, 424 N.E.2d 1246.) After thoroughly reviewing the record, we find that the inconsistencies noted by defendant are insufficient to raise a reasonable doubt of his guilt, and that there was sufficient evidence to sustain the verdict beyond a reasonable doubt.

For the aforementioned reasons, the judgment of the circuit court is affirmed. The State's request to assess defendant $50 in costs for defending this appeal is granted. *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.